

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00018-CR

_____

RICHARD BENNINGTON, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from County Criminal Court No. 5
Denton County, Texas
Trial Court No. F19-3146-158

---

Before Sudderth, C.J.; Birdwell and Walker, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant Richard Bennington appeals his conviction for intoxication assault. *See* Tex. Penal Code Ann. § 49.07(a)(1). In two issues, Bennington argues (1) that the trial court erred in allowing the State to introduce expert testimony on retrograde extrapolation because the testimony was unreliable and (2) that the evidence was legally insufficient to justify the jury's finding of guilt because, without the erroneously admitted retrograde extrapolation testimony, the State did not have sufficient evidence to prove intoxication. Because we conclude that the trial court did not abuse its discretion by admitting the complained-of testimony and that the evidence was legally sufficient, we affirm the conviction.

### I. Factual Background

At approximately 4:45 a.m. on October 24, 2018, Bennington rear-ended Barry McCabe's vehicle while he was stopped at an intersection. Bennington's vehicle hit McCabe's at such a high rate of speed that the two vehicles "fused together" and spun around in the intersection. It did not appear to responding officers that Bennington had taken any kind of evasive action to avoid the collision, such as braking or swerving.[1] Responders had to use the Jaws of Life to remove McCabe from his vehicle. He suffered severe injuries resulting in a three-week hospital stay, inpatient

---

[1]The intersection was described as being lighted, having no obstructions, and being a "clear-cut straight roadway." A driver would have had approximately one-half of a mile of visibility in that section of the road and likely would have been able to see a vehicle stopped at the intersection.

physical therapy, outpatient physical therapy, loss of function in one kidney, nerve damage, and continued doctors' visits for several years.

Chief Kirk Gomes with U.S. Customs and Border Protection came upon the accident on his way to work that morning and called 911.[2] While Chief Gomes spoke to McCabe, who was trapped in his vehicle, Bennington approached him and identified himself as the driver of the other vehicle. Bennington appeared to be concerned about McCabe. He also had a lit cigarette in his hand, which concerned Chief Gomes because they were surrounded by leaking auto fluid, so he asked Bennington to put his cigarette out. At trial, Chief Gomes testified that the way Bennington was acting led him to believe that he did not have the use of his normal faculties. But Chief Gomes, who was not on duty, did not make any assessments as to Bennington's intoxication.

Officer Alvin Carey, formerly with the Northlake Police Department, responded to the scene of the accident. When he first contacted Bennington, he observed that Bennington smelled of cigarettes and beer and that there were multiple open beer cans in his vehicle, though he believed that the beer cans may have been "old." When Officer Carey asked Bennington what had happened, he responded that he was not sure how the accident had happened. This led Officer Carey to believe that Bennington did not have the normal use of his mental and physical faculties. He also

---

[2]The State introduced and the trial court admitted evidence of the 911 call. Bennington did not call 911.

believed that Bennington may have been smoking a cigarette to try to "mask" the odor of alcohol. Officer Carey quickly determined that he would need to conduct a driving while intoxicated (DWI) investigation.

Officer Carey asked Bennington if he had been drinking, and he responded that he had been drinking beer and that he stopped drinking around 2:00 a.m. Bennington also stated that he had not eaten any food that day or the day before. Officer Carey attempted to perform the horizontal gaze nystagmus (HGN) test with Bennington but was unsuccessful due to Bennington's physical pain, though he refused medical treatment. He did not attempt to administer any other standardized field sobriety tests because of Bennington's pain.[3] Specifically, Bennington would wince in pain only when Officer Carey conducted his DWI investigation but not during normal conversation. Officer Carey sought the assistance of another, more experienced officer, now-Sergeant Barry Sullivan with the Trophy Club Police Department, who assisted in the DWI investigation. Sergeant Sullivan made his own observations of Bennington and then administered the HGN test. Bennington presented six out of six clues indicating intoxication. Sergeant Sullivan also observed that Bennington would grimace in pain or act like he was suffering only when the officers were investigating

---

[3]At trial, Officer Carey explained that at the time of the accident, he had little experience performing standardized field sobriety tests and that this accident was only his first or second DWI investigation, which made him unsure of how to proceed. He admitted that he did not initially think that Bennington was intoxicated.

his possible impairment. He testified that he believed that Bennington did not have the normal use of mental and physical faculties.

Based on the results of the HGN test, the severity of the accident, Bennington's apparent failure to try to prevent the accident, and Sergeant Sullivan's and Officer Carey's observations of him after the accident, the officers determined that he had been intoxicated at the time of the accident. Officer Carey arrested Bennington for the offense of DWI and obtained a warrant to collect a sample of his blood.[4] At the hospital, Bennington became agitated and did not want to give a blood sample; he became aggressive and several officers had to hold him down by his arms and legs to keep him still enough for the phlebotomist to draw blood. The phlebotomist drew the blood sample at 8:50 a.m. the day of the accident.

Bennington was subsequently indicted for the offense of intoxication assault. At Bennington's trial, expert witness Meagan Richey, a forensic scientist with the Texas Department of Public Safety, testified—over Bennington's objection—about retrograde extrapolation, which she described as "a scientific estimation of an alcohol concentration at a previous time, generally, the time of the offense, using a measurement from a later time, generally, the time of the blood draw." Using retrograde extrapolation, Richey estimated that Bennington's blood–alcohol concentration (BAC) at the time of the accident was within the range of 0.081 to

---

[4]Officer Carey had requested that Bennington voluntarily provide a blood sample, but he refused to consent to a blood draw.

0.141. A jury convicted Bennington of intoxication assault and assessed his punishment at five years' incarceration, and the trial court sentenced him accordingly. This appeal followed.

## II. Retrograde Extrapolation Testimony

In his first issue, Bennington contends that the trial court erred in admitting the State's expert testimony on retrograde extrapolation because the testimony was unreliable and that he was harmed by the error.

Retrograde extrapolation is the computation back in time of the blood–alcohol level that estimates a person's BAC at the time of driving based on a test result from some later time, which is accomplished using absorption and elimination rates in the body. *Mata v. State*, 46 S.W.3d 902, 908–09 (Tex. Crim. App. 2001). Absorption is the process of alcohol passing from the stomach and intestines into the blood. *Id.* at 909 (citing Nat'l Inst. on Alcohol Abuse & Alcoholism, Alcohol Alert, "Alcohol Metabolism," No. 35 (Jan. 1997)). At some point after the person stops drinking, the person's BAC will reach a peak. *Id.* Elimination—also known as post-absorption— refers to the period after the peak in which the BAC begins to fall as alcohol is eliminated from the person's body through the liver at a slow but consistent rate. *Id.* (citing Jennifer Pariser, *Note: In Vino Veritas: The Truth About Blood Alcohol Presumptions in State Drunk Driving Law*, 64 N.Y.U.L. Rev. 141, 149 (1989)).

## A. Standard of Review and Applicable Law

We review a trial court's decision to admit scientific evidence for an abuse of discretion. *See Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005). As such, we will not disturb the trial court's ruling if it was within the zone of reasonable disagreement. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011).

Scientific evidence must be reliable. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). To show reliability, the proponent of scientific evidence must show by clear and convincing evidence that (1) the underlying theory is valid, (2) the technique applying the theory is valid, and (3) the technique was properly applied on the occasion in question. *Id.* at 573; *Hoover v. State*, No. 02-16-00019-CR, 2017 WL 56163, at *2 (Tex. App.—Fort Worth Jan. 5, 2017, pet. ref'd) (mem. op., not designated for publication) (citing *Kelly*). The science of retrograde extrapolation may be reliable under certain circumstances. *Mata*, 46 S.W.3d at 916. A paramount consideration is the testifying expert's ability to clearly and consistently apply the science and explain it with clarity. *Id.* The expert must also demonstrate a knowledge of the difficulties associated with a retrograde extrapolation and an awareness of the subtleties and risks inherent in any extrapolation. *Id.* It is the trial court's responsibility to determine whether the proffered evidence is sufficiently reliable and relevant to the jury. *Id.* at 908.

In evaluating the reliability of retrograde extrapolation evidence, courts should consider (a) the length of time between the offense and the tests administered; (b) the

number of tests given and the length of time between each; and (c) whether, and if so, to what extent, any individual characteristics of the defendant were known to the expert in providing his or her extrapolation. *Id.* at 916. Some of these characteristics include, but are not limited to, the person's weight, gender, typical drinking pattern, tolerance for alcohol, amount of alcohol consumed, what the person ingested, the duration of the drinking spree, the time of the last drink, and whether and what the person had eaten before, during, or after the drinking. *Id.* The *Mata* court provided the following guidelines when balancing the factors:

> If the State had more than one test, each test a reasonable length of time apart, and the first test were conducted within a reasonable time from the time of the offense, then an expert could potentially create a reliable estimate of the defendant's BAC with limited knowledge of personal characteristics and behaviors. In contrast, a single test conducted some time after the offense could result in a reliable extrapolation only if the expert had knowledge of many personal characteristics and behaviors of the defendant. Somewhere in the middle might fall a case in which there was a single test a reasonable length of time from the driving, and two or three personal characteristics of the defendant were known to the expert.

*Id.* at 916–17. Notably, *Mata* does not require that every single factor be known "in order to produce an extrapolation with the appropriate level of reliability." *Id.* at 916.

## B. The Testimony

During a Rule 702 hearing, Richey testified that at the time Bennington's blood sample was taken, his BAC was 0.041 grams of alcohol per 100 milliliters of blood.[5] She also explained the concept of retrograde extrapolation to the trial court and

---

[5]Bennington's counsel stipulated to Richey's expertise in BAC and testing but challenged the retrograde extrapolation evidence.

testified that the science behind the retrograde extrapolation calculation considers the defendant's BAC, the time frame between the time of the stop and the time of the blood draw, and the time of the defendant's last alcoholic drink, which is used to determine whether the defendant was in the post-absorption phase, or elimination, at the time of the accident. These factors, which are accepted by the scientific community, must be known to calculate retrograde extrapolation. Richey asserted that the formula she uses to calculate retrograde extrapolation is reliable and generally accepted in her field.

According to studies in Richey's scientific field, alcohol is completely absorbed approximately one hour after the person's last drink, so in calculating retrograde extrapolation, it is important that at least one hour has passed from the time of the person's last drink to the time of the accident or traffic stop. Richey explained that she cannot calculate retrograde extrapolation unless the person is fully in elimination, which typically occurs more than an hour after the person consumed their last alcoholic drink. Elimination refers to the body's getting rid of alcohol through excretion, breath, sweat, and urine, which occurs at a slow and steady rate. The standard range of elimination rates is 0.01 to 0.025 percent per hour, which is found in studies accepted by Richey and others in the scientific community. She stated that she uses that standard range when calculating retrograde extrapolation and that she used that range in this case.

Richey considered the time between the accident (4:45 a.m.) and blood draw (8:50 a.m.), the BAC found in the analysis (0.041), and the time of the last drink (2:00 a.m.). Based on those factors, and using the standard elimination rates, she calculated Bennington's BAC to be within the range of 0.081 to 0.141 at the time of the accident. When presented with and asked about additional factors—male, five feet nine inches in height, weight of 165 pounds, drinking beer, empty stomach/no food intake—Richey testified that she would not need those factors for her calculation because they would not be relevant to the person's elimination rate. Rather, those factors are relevant to only the absorption process. In other words, weight, gender, alcohol tolerance, the type of alcohol consumed, or how quickly the alcohol was consumed may affect the absorption rate and peak BAC, but these factors do not impact the retrograde calculation for a person in the elimination phase. And while knowing the person's drinking pattern may be helpful, as long as a sufficient period of time has passed between the time of the last drink and the time of the accident, then the assumption is that the person is in the post-absorption phase.

At the end of the Rule 702 hearing, the trial court asked the State's counsel for clarification on Richey's testimony. The State clarified that Richey had used Bennington's own statement that his last drink was at 2:00 a.m. in her calculations and that she did not need to consider other factors such as his weight, gender, number of drinks, or food intake because he was well within the elimination phase. And because Richey's calculations would be presented to the jury as a scientific hypothetical, rather

than scientific fact, the trial court ultimately admitted the testimony for the jury's consideration. Richey explained the concept of retrograde extrapolation to the jury and testified that it is reliable when understood that it is only an estimation. She was then given, as a hypothetical, the time of last drink, the time of the accident, the time of the blood draw, and a BAC of 0.041, and using the standard elimination rate of 0.01 to 0.025, Richey testified that the BAC range was 0.081 to 0.141 at the time of the accident. She went on to explain to the jury how she calculated that range.

## C. Analysis

Relying on *Mata*, Bennington argues that Richey's retrograde extrapolation testimony was not reliable because she did not consider other factors such as gender, weight, pattern of drinking, tolerance for drinking, or whether Bennington ate during, before, or after drinking. But as Richey explained to the trial court, these specific characteristics were unnecessary for her retrograde extrapolation calculation. She used a scientifically accepted elimination rate range of 0.01 to 0.025 instead of calculating a specific elimination rate for Bennington. *See Morin v. State*, No. 02-17-00115-CR, 2018 WL 3763901, at *4 (Tex. App.—Fort Worth Aug. 9, 2018, pet. ref'd) (mem. op., not designated for publication) (holding retrograde extrapolation testimony was reliable when expert used broad-range elimination rate instead of calculating specific individualized rate); *Smothers v. State*, No. 02-03-056-CR, 2004 WL 1597652, at *6 (Tex. App.—Fort Worth July 15, 2004, no pet.) (not designated for publication) ("[M]any of the more specific characteristics [of appellant] were unnecessary because

11

[the expert] used the accepted average rate for elimination of alcohol at 0.015 grams per hour, instead of calculating a specific elimination rate for appellant."); *see also Mata*, 46 S.W.3d at 916. She further clarified that these factors affect the alcohol-absorption process and would therefore be relevant if the person were still absorbing alcohol, which was not the case here. *Cf. Morin*, 2018 WL 3763901, at *3 (clarifying that "things like food, pace of drinking, a person's weight, and other variables would impact a person's alcohol-absorption rate").

Further, unlike the expert in *Mata*, Richey knew the time of Bennington's last drink—according to his own statement that his last drink had been at 2:00 a.m. She was therefore able to calculate the retrograde extrapolation because, based on the time of last drink, Bennington would have been fully in elimination or the post-absorption phase. *See Mata*, 46 S.W.3d at 905 (noting the expert conceded that he did not know when the defendant's last drink was and that he did not have "enough information to determine whether [the defendant] was in the absorption phase or the elimination phase at the time of the breath test"). Based on the factors that Richey considered— the time of last drink, the time of the accident, the time of the blood draw, and the BAC results—and using a scientifically accepted elimination rate range, she was able to calculate an estimated BAC range for the time of the accident. She acknowledged, however, that her calculations were based on the assumption that Bennington was in the post-absorption phase, which depended on the accuracy of Bennington's own statement that his last drink had been at 2:00 a.m.

12

Relying on a case from our sister court in El Paso, Bennington also complains that there was only a single test and that four hours had passed between the time of the accident and the time of the blood draw, which he claims "significantly impacts" the reliability of Richey's calculations. *See Perez v. State*, No. 08-18-00188-CR, 2021 WL 3721835, at *5 (Tex. App.—El Paso Aug. 23, 2021, pet. ref'd) (not designated for publication). In *Perez*, unlike here, the defendant was arrested following a traffic stop—not an accident—and the expert did not know the time of the defendant's alcohol consumption. *Id.* at *1, *5.[6] Here, Richey knew the time of Bennington's alcohol consumption because he had told Officer Carey that his last drink was at 2:00 a.m. When asked about the number of hours between the accident and the blood draw, Richey testified that four hours is "probably longer than most normal DWIs" but "pretty normal for an accident." While she agreed on cross-examination that to estimate a BAC from ten to twelve hours back may render the calculations less reliable, she asserted that it is "highly likely" that a person who had last consumed alcohol two and a half hours prior to an accident would be in the elimination phase by the time of the accident.

---

[6]The *Perez* court did note, however, that the defendant's actions unnecessarily increased the three-hour time difference between the offense and blood draw: the defendant's "refusal to provide a breath sample, then agreeing to the blood draw, and then later refusing the blood draw, which required the execution of a warrant." *Id.* at *7. Here, we similarly note that Bennington's actions—refusing to consent to a blood draw, ostensibly using his "pain" to obstruct the administration of standardized field sobriety tests, and showing aggression at the hospital to the extent that several officers had to hold him down for the blood draw—unnecessarily increased the time difference between the accident and blood draw. *See id.*

Bennington's case is further distinguishable because Richey used a scientifically accepted elimination rate range to reach an estimated BAC range of 0.081 to 0.141 at the time of driving. Richey explained that when calculating retrograde extrapolation, she provides the BAC as an estimated range to overcome the inherent risks involved with not knowing a particular defendant's exact elimination rate. The expert in *Perez*, however, used a "conservative 0.01 elimination rate" to calculate a precise retrograde extrapolation BAC rather than an estimated range. *See id.* at *3.

Moreover, the reliability of retrograde extrapolation evidence does not turn on whether multiple blood tests were given. *See Morin*, 2018 WL 3763901, at *4 (citing *Mata*, 46 S.W.3d at 916–17); *Smothers*, 2004 WL 1597652, at *6. Nor does *Mata*—a case involving breath tests—require that multiple blood tests be given before retrograde extrapolation evidence may be deemed reliable. *See generally* 46 S.W.3d 902. Rather, "the factors must be balanced." *Id.* at 917. Here, the record shows that Richey—whose expertise was not challenged—used a range of scientifically accepted elimination rates to calculate a retrograde extrapolation BAC range for a person that was in the elimination or post-absorption phase at the time of the blood draw.

We conclude that under the circumstances, Richey's testimony was sufficiently reliable and relevant to the jury. Richey's testimony demonstrated that she clearly and consistently applied the science of retrograde extrapolation and that she explained it with clarity. She also demonstrated that she knew and understood the difficulties associated with the science and that she was aware of its subtleties and inherent risks.

14

Accordingly, the trial court did not abuse its discretion by permitting the State to introduce the testimony.

We overrule Bennington's first issue.

### III. Sufficiency of the Evidence

In his second issue, Bennington contends that the evidence is legally insufficient to justify the jury's finding of guilt because, without the erroneously admitted retrograde extrapolation testimony, the State did not have sufficient evidence to prove intoxication.

### A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine

15

whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608. The standard of review is the same for direct- and circumstantial-evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021), *cert denied*, 142 S. Ct. 859 (2022).

Contrary to Bennington's contention on appeal, when performing a sufficiency review, we must consider all the evidence admitted at trial, even if it was improperly admitted. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

**B. Applicable Law**

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson*, 443 U.S. at 316, 99 S. Ct. at 2787; *see* U.S. Const. amend. XIV. To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial.

16

*Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021); *see Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

As applicable here, a person commits the offense of intoxication assault if the person "by accident or mistake . . . while operating a motor vehicle in a public place while intoxicated, by reason of that intoxication causes serious bodily injury to another." Tex. Penal Code Ann. § 49.07(a)(1). "Intoxicated" means "not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . into the body; or [] having an alcohol concentration of 0.08 or more." *Id.* § 49.01(2). "Serious bodily injury" means "injury that creates a substantial risk of death or that causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 49.07(b).

17

## C. Analysis

Bennington challenges only one element of the charged offense: intoxication. We conclude that the cumulative force of the evidence sufficiently shows that Bennington was intoxicated when he rear-ended McCabe's vehicle. Specifically, the evidence in the record supports the jury's finding that Bennington did not have the normal use of his mental or physical faculties by reason of the introduction of alcohol into his body and/or that he had a BAC of 0.08 or more at the time of the accident. *See id.* § 49.01(2).

At trial, the State introduced, and the trial court admitted, evidence showing that Bennington did not have the normal use of his mental or physical faculties at the time of the accident:

- At approximately 4:45 a.m., Bennington rear-ended a vehicle stopped at an intersection, despite that intersection having been unobstructed, lighted, and on a "clear-cut straight" roadway with half a mile of visibility;

- Bennington hit the vehicle at such a high rate of speed that the two vehicles "fused together" and spun around in the intersection;

- It was apparent that Bennington had not taken any kind of evasive action to try to avoid the collision, such as braking or swerving;

- Bennington did not call 911;

- After the accident, Bennington was smoking a cigarette near leaking auto fluid;

- Bennington smelled of cigarettes and beer, and there were multiple open beer cans in his vehicle;

- Officer Carey testified that he believed Bennington may have been smoking a cigarette to try to "mask" the odor of alcohol;

18

- Bennington could not tell the officers how the accident had happened;

- Officer Carey testified that, based on his training and experience and on his observations of Bennington, he believed that Bennington had lost the use of his normal mental and physical faculties;

- Bennington admitted to drinking alcohol and stated that his last drink had been at 2:00 a.m.;

- Bennington told the officers that he had not eaten anything in two days;

- Bennington declined medical treatment despite complaining of physical pain;

- Bennington would grimace in pain or act like he was suffering only when the officers started investigating his possible impairment;

- Bennington presented six out of six clues of intoxication during the HGN test[7];

- Sergeant Sullivan testified that he believed Bennington did not have the normal use of his mental and physical faculties;

- Bennington refused to consent to a blood draw[8]; and

---

[7]In his appellate brief, Bennington fleetingly argues—without supporting authority—that Sergeant Sullivan did not properly administer the HGN test and that without the "erroneously performed" HGN test, Bennington would not have been arrested for DWI. But as we have stated, we must consider all the evidence admitted at trial, whether properly or improperly admitted. *See Jenkins*, 493 S.W.3d at 599; *Moff*, 131 S.W.3d at 489–90; *Dewberry*, 4 S.W.3d at 740. We must also presume that the jury resolved any conflicting inferences with respect to the HGN test in favor of the guilty verdict, and we must defer to that resolution. *See Braughton*, 569 S.W.3d at 608. Lastly, we "must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence." *Villa*, 514 S.W.3d at 232. Reviewing the evidence to the contrary would be improperly narrow. *See id.*

[8]Bennington's refusal is probative of his intoxication and tends to show a consciousness of guilt. *See* Tex. Transp. Code Ann. § 724.061; *Bartlett v. State*, 270 S.W.3d 147, 153 (Tex. Crim. App. 2008); *Griffith v. State*, 55 S.W.3d 598, 601 (Tex. Crim. App. 2001); *Viers v. State*, No. 12-19-00288-CR, 2020 WL 5406277, at *3 (Tex. App.—Tyler Sept. 9, 2020, pet. ref'd) (mem. op., not designated for publication).

- Bennington became agitated and aggressive at the hospital to the extent that several officers had to hold him down so that the phlebotomist could obtain his blood sample pursuant to a warrant.[9]

We conclude that the record indicates that Bennington did not have the normal use of his mental or physical faculties by reason of the introduction of alcohol into his body. Thus, even without Richey's testimony on retrograde extrapolation—which we have determined was properly admitted—the evidence supports the jury's finding beyond a reasonable doubt that Bennington was intoxicated at the time of the accident.

Considering all the evidence admitted at trial, we also conclude that the record indicates that Bennington had a BAC of 0.08 or more at the time of the accident. Richey explained the concept of retrograde extrapolation and testified that Bennington's BAC at the time of the accident was somewhere in the range of 0.81 to 0.141. The jury, as factfinder, was free to judge the weight and credibility of Richey's testimony and resolve any conflicting inferences therefrom.

Viewing all the evidence submitted and any reasonable inferences therefrom—including the retrograde extrapolation testimony—in the light most favorable to the verdict, we conclude that the jury could have found the "intoxicated" element of the offense of intoxication assault. We therefore hold that the jury was rationally justified in finding Bennington guilty of that offense and overrule Bennington's second issue.

---

[9]The jury could infer from Bennington's behavior at the hospital that he was intoxicated. *See Viers*, 2020 WL 5406277, at \*3 (concluding evidence was sufficient to prove appellant's intoxication when appellant refused to give a breath specimen and fought the medical technicians attempting to draw blood pursuant to a warrant); *see also* Tex. Transp. Code Ann. § 724.061; *Bartlett*, 270 S.W.3d at 153.

## V. Conclusion

Having overruled both of Bennington's issues, we affirm his conviction.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: November 22, 2023